J-S28042-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: I.U., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.U., FATHER | : | No. 136 MDA 2018 |

Appeal from the Order Entered December 22, 2017
in the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000250-2017

BEFORE: OLSON, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED NOVEMBER 20, 2018**

B.U. ("Father") appeals from the Permanency Review Order directing, *inter alia*, that the York County Office of Children, Youth and Families ("CYF" or the "Agency") shall cease providing services to Father with regard to reunification with I.U. ("Child"), born in October 2012.[1]  We reverse and remand for further proceedings.

The trial court explained the factual background and procedural history of this case as follows:

> [Child] has been residing with her mother, [A.U. ("Mother")].
> [CYF] had prior involvement with [M.C.] and the family in 2013,
> due to allegations of sexual abuse of [M.C.] by [Father].  [Father]
> pled guilty to [possession of] [c]hild [p]ornography and was
> sentenced to prison.   [Father] is a "Founded" perpetrator of
> sexual abuse through the Childline and Abuse Registry[,] and also
> is a Megan's Law Tier I Offender.   [Father] was released from

---

[1] Child has an older sister, M.C., born in 2007.  J.C. is M.C.'s father.  Father filed this appeal with regard to Child, and M.C. is not the subject child of this appeal.  Nevertheless, we will discuss M.C. as she is integral to the case.

prison [in July 2017], and [shortly thereafter], [CYF] was advised that he was residing in Mother's residence with [Child] and [M.C. (collectively "the Children").] Attempts to develop a safety plan were unsuccessful. A maternal aunt, [L.F.], was contacted and agreed to be a placement resource for [the Children,] and was approved as emergency caregiver. The Honorable Andrea Marceca Strong verbally awarded temporary legal and physical custody of [the Children] to [CYF] for emergency caregiver placement with the maternal aunt, [L.F.], on July 19, 2017. [On July 24, 2017, the trial court held a shelter care hearing regarding the Children and entered a shelter care order.] On August 4, 2017, the dependency hearing regarding [the Children] was continued. By Order of Court dated August 4, 2017, custody of [the Children] was returned to [M]other. [Mother] has completed a Non-Offending Parent Evaluation through Triad Treatment Specialists[, Inc. ("Triad")]. Father has completed an Evaluation through [Triad].

Order, 10/6/17, at 1.

Following the continued dependency hearing, and pursuant to an agreement between the parties, the trial court adjudicated Child dependent.[2] The trial court stated that legal custody would remain with both parents, but that Mother would maintain physical custody. The trial court further directed that Child have no unsupervised contact with Father, and that any contact be supervised by CYF or a party approved by CYF. The trial court also ordered Father to fulfill various conditions and requirements, including maintaining safe housing, attending counseling sessions, and following all recommendations made by Triad.

---

[2] The trial court also adjudicated M.C. dependent. N.T., 10/6/17, at 4. The trial court further directed, by agreement of the parties, that there was to be no contact between Father and M.C. *Id.* at 15.

On December 22, 2017, the trial court held a permanency review hearing with regard to the Children. At the hearing, Attorney Kristina Bange ("Attorney Bange") represented the Agency; Attorney Scott Beaverson represented the Children as Guardian *Ad Litem*; Attorney Sherry Myers represented Mother; Attorney Scott Lineberry represented Father; and Attorney Thomas Gregory represented J.C. (M.C.'s father). Mother and Father were present, but J.C. was not present. Also present were Erika Edwards ("Edwards"), the caseworker for CYF; Kaitlyn Grydlick ("Grydlick"), the family advocate from Catholic Charities in-home team, and Suzanne Kearse ("Kearse"), the family therapist from Catholic Charities.

At the hearing, Edwards and Kearse testified. The trial court then asked for input from counsel to determine whether Father could reside in the same home with Mother and the Children. Thereafter, the trial court conducted a lengthy exchange regarding the reunification services provided by CYF to Father, and decided that services should be terminated.

On December 22, 2017 the trial court entered the Permanency Review Order, stating the following:

> AND NOW, this 22nd day of December, 2017, the [c]ourt hereby enters the following findings and order:
>
> **Permanency Plan – Consultation with Child**
>
> CONSULTATION - The court has consulted with [Child] regarding [Child's] permanency plan in a manner appropriate to [Child's] age and maturity.

CONSULTATION – The views of [Child] regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the Guardian *Ad Litem*.

**PERMANENCY PLAN – Compliance**

MOTHER – There has been moderate compliance with [the] permanency plan, in that [Mother] has been cooperative with the Agency and service providers. A Catholic Charities [t]eam began working with Mother on November 17, 2017. [Mother] has maintained stable and appropriate housing for herself and [the Children]. She originally scheduled parenting classes and therapy through Family Child Resources; however, [she] later found that those classes and the therapy were not the correct sessions. She is working on getting Non-Offending Parenting classes and therapy completed through [Triad]. Mother refuses to sign educational, medical or dental releases for the Children. Mother is starting Non-Offending Parenting Classes and Therapy on Wednesday[,] December 27, 2017.

FATHER – There has been moderate compliance with [the] permanency plan, in that [Father] is currently residing in Felton[, Pennsylvania,] and is employed full-time. He has supervised visits with [Child]. He is receiving Sex Offender therapy through [Triad]. His first group session started November 17, 2017. He also completed intake assessments for anger management[,] and drug and alcohol counseling. A written report from [Triad] (Addendum to Initial Evaluation) was received today and shared with all [c]ounsel and the [c]ourt (not marked as an Exhibit).

CHILD – There has been full compliance with [the] permanency plan, in that [Child] is five years of age and in the legal and physical custody of her mother. She attends the Head Start Program at [her elementary school]. She is not receiving any treatment. Child is doing well in [Mother's] custody.

**PERMANENCY PLAN – Reasonable efforts to finalize**

Reasonable efforts have been made by the [Agency] to finalize [Child's] permanency plan.

**PERMANENCY PLAN/PLACEMENT GOAL**

The Permanency Plan developed for [Child] is appropriate and feasible.

The Current Permanent Placement Goal is appropriate and feasible.

**CURRENT PLACEMENT – Child's Safety**

[Child] is safe in the current placement setting.

**SERVICES – for Children age 14 and older**

[Child] has not yet attained the age of 14.

**ORDER OF COURT – On the basis of the above findings, IT IS HEREBY ORDERED THAT:**

**Order of Court**

[] Child shall be under the protective supervision of the Agency.

Physical Custody of [] Child shall remain with [Mother].

Legal Custody of [] Child shall remain with the [Mother].

**EDUCATION/EVALUATIONS**

[Child's] educational needs are being addressed.

In order to ensure the stability and appropriateness of [] Child's education, the agency shall provide the following services: [Child] attends Head Start at [her elementary school].

**FINDINGS/ORDERS**

THE COURT FURTHER FINDS:

[CYF] has ran [*sic*] Background Checks of Paternal Aunt, [A.R.], and she has been cleared.  Upon viewing the [v]ideo and signing an Affidavit of Accountability of Supervisor[,] [s]he may be an additional [s]upervisor of Father's contact with [Child].

THE COURT FURTHER ORDERS:

The Adjudication of Dependency of [Child] shall continue.

Legal and Physical Custody of the [] Child shall remain with [] Mother.

[Father] is to never have unsupervised contact with [] Child or [M.C.] All contact with [] Child or [M.C.] must be supervised.

The Agency [is] to stop providing services to Father [] in all regards to [reunification].

Such disposition having been determined to be best suited to the protection and physical, mental and moral welfare of [Child].

Permanency Review Order, 12/22/17, at 1-2 (emphasis in original, some capitalization omitted).

Father timely filed a Notice of Appeal,[3] along with a Concise Statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court issued a Rule 1925(a) Opinion.

On appeal, Father raises the following question for our review:

Whether the [trial court] committed an abuse of discretion and/or error of law when it directed [CYF] to stop providing reunification services to Father after only 2 months, 16 days[,] despite Father's compliance with services and where the record failed to support that the [trial c]ourt's decision was in the best interest of [] Child[?]

Brief for Father at 6.

_____

[3] We note that the trial court suggests that the appeal is interlocutory. *See* Trial Court Opinion, 1/29/18, at 1, 2. "It is well settled that jurisdictional issues, such as the appealability of an order, raise legal questions over which our review is *de novo* and plenary[.]" ***In Interest of Z.V.***, 158 A.3d 665, 669 (Pa. Super. 2017). An order "suspending reunification efforts is an appealable order." ***Id.*** Thus, we conclude that the December 22, 2017 Permanency Review Order was appealable. ***See id.***

Our standard of review in a dependency case is as follows:

[T]he standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion[.]

*In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (citation and quotation marks omitted).

Father contends that the trial court abused its discretion in directing CYF to discontinue reunification services to him after only 2 months and 16 days despite his compliance with the services. Brief for Father at 14, 20. Father asserts that, although the trial court explained, for the first time, in its Rule 1925(a) Opinion that its decision to discontinue reunification services to Father was based upon a finding of aggravated circumstances, the trial court did not make such a finding in its Permanency Review Order. *Id.* at 14-15; *see also id.* at 17 (wherein Father argues that the trial court did not make an aggravated circumstances finding on the record). Father also points out that neither CYF nor the Guardian *Ad Litem* filed a motion for a finding of aggravated circumstances. *Id.* at 16, 17.

Father contends that in the absence of aggravated circumstances, this Court must review the discontinuation of services in light of Father's compliance and progress with the services. *Id.* at 17-18, 19; *see also id.* at 18 (wherein Father points out that he was working full-time, he was attending offending parent treatment, attending anger management and drug and

- 7 -

alcohol counseling, and his drug screens were negative). Father argues that the discontinuation of services conflicts with the stated purpose of the Juvenile Act, namely, the preservation of a family when possible and a child's best interests. *Id.* at 17-18, 20.

Notably, CYF and the Guardian *Ad Litem* agree with Father's argument and advocate that the reunification services be reinstated. *See* Brief for CYF at 2-4 (stating that the record does not support the trial court's decision to discontinue reunification services and that the trial court directed CYF to give up on Father); Brief for Guardian *Ad Litem* at 12-16 (noting that no party had filed a motion, discussed, or testified to a finding of aggravated circumstances; the findings in the Permanency Review Order was at odds with the trial court's reunification conclusion; and that Child has a normal father/daughter relationship with Father, and it is in her best interests to work on the relationship).

Agencies are required to make reasonable efforts to allow parents the opportunity to "work toward reunification with their dependent children[.]" *In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014). "By requiring only 'reasonable efforts' to reunify a family, the statute recognizes that there are practical limitations to such efforts." *In Interest of C.K.*, 165 A.3d 935, 942 (Pa. Super. 2017) (citation omitted). "It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutes a reasonable effort towards

reunification." *Id.* (citation omitted). Further, "[b]ecause the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child." *Id.*; *see also id.* at 944 (stating that "[a]ssisting parents with achieving the Juvenile Act's goal of family unity in a timely fashion ultimately benefits children, as it will result either in a successful safe reunification or a clearer picture of the parents' inability to remedy the conditions causing the child to be out of their care[.]").

It is well-settled that "[w]hen a court finds aggravated circumstances exist, it is well within its discretion to order the cessation of reunification services." *In re A.H.*, 763 A.2d 873, 878 (Pa. Super. 2000).

> The Juvenile Act provides that if a county's children and youth social service agency "reasonably believes that aggravated circumstances exist, it shall file the appropriate petition as soon as possible but no later than 21 days from the determination by the county agency that aggravated circumstances exist." 42 Pa.C.S.A. § 6334(b). The agency's petition must "include a statement of the facts the county agency ... intends to prove to support the allegation." *Id.*

*In Interest of J.M.*, 166 A.3d 408, 418 (Pa. Super. 2017). The Juvenile Act defines "aggravated circumstances" as including, *inter alia*, the following:

> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.
>
> ***
>
> (6) The parent of the child is required to register as a sexual offender under Subchapter H of Chapter 97 (relating to

registration of sexual offenders) or to register with a sexual offender registry in another jurisdiction or foreign country.

42 Pa.C.S.A. § 6302 (footnote omitted).

If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to disposition of dependent child).

42 Pa.C.S.A. § 6341(c.1).

At the permanency review hearing, the trial court and the parties stated

the following regarding the services provided by CYF to Father:

THE COURT: I guess my concern is raising everyone's hopes, particularly Mother's. And spending taxpayers' dollars trying to give services to [Father] when this Judge has trouble picturing any scenario in which I would allow him to go back to the household.

Let's fast forward. At some point the Agency will be out of this case. I envision at this point there being a custody order that would specifically say that any contact by [Father] with either of these children would have to be supervised by an impartial supervisor, not Mother or somebody like that.

I guess in light of that, are we going to continue to throw services at a goal that this [J]udge isn't going to allow.

ATTORNEY LINEBERRY: The [c]ourt directed the services.

THE COURT: Yeah, I understand that. And I'm looking at the Triad evaluation that you referred to. I'm bluntly getting the impression I'm the only one who read it.

His ADHD medication makes him quote horny, unquote. He admitted to viewing a lot of pornography, and has asked [Mother] to take pornographic pictures. It's just on and on and on.

ATTORNEY LINEBERRY: And then makes recommendations for services, which the [c]ourt ordered.

THE COURT: That's exactly why I'm bringing this up, Attorney Lineberry. I don't want to waste any taxpayers' dollars on services that I don't think are - if this man had done something just a little more egregious, he wouldn't be allowed contact with any minors ever for the rest of his life.

Attorney Bange, I think my question was directed to you. And I understand putting you on the spot.

ATTORNEY BANGE: With regard to the tax dollars, I was going back to the question before that with regard to the goal. I mean, the goal currently is remain with parent. There's been reunification with a parent.

THE COURT: Exactly.

ATTORNEY BANGE: So I mean, [Child] is dependent because we've been providing services to make it safe for that to continue to occur without Agency involvement and without service providers.

THE COURT: Exactly. As to Mother.

ATTORNEY BANGE: And as to Father.

THE COURT: As perhaps to one [f]ather.

ATTORNEY BANGE: Well, I mean I think we're in the business, as the child welfare agency, of assuring the welfare of the children. And the way that we do that is we go through a process. We remove the children when it's unsafe for them to be in the home. We return the children when it's then safe. We've done that.

[Father] is out of the home, working on his own issues as recommended by specialists in the field. He is not, as I understand, listed as a Megan's Law offender. He's not on the registry. I don't know.

THE COURT: I was assuming not. My statement - -

ATTORNEY BANGE: But I don't know.

ATTORNEY LINEBERRY:  He is required to.  I can't remember what Tier it is[,] though.

ATTORNEY BANGE:  I guess clarification on what restriction, if any, there is concerning contact with minors as a result of that. But I mean, he's doing what he would probably have to do through the criminal system as far as rehab and, you know, treatment.

And so that's the whole reason that a facility or a program like Triad or Commonwealth Clinical Group exists.  They wouldn't be providing services to anyone if there was never an opportunity for people to rehabilitate or try to change or get on a certain path.

THE COURT:  Attorney Bange, there are certain offenses our society has accepted that can't be rehabilitated.  We put people in prison for their life for murder because we feel there's no way we can let them out safely.

There are sexual offenders who can never have contact with children.  And all the services in the world our society has decided are not going to change that.  That's a lifetime requirement.

I want it in the order that [Father] is to never have contact with either child except supervised, at least until further order of [c]ourt.

I'll leave that up to the Agency then.  You can waste taxpayers' dollars on services for [Father] if you wish.  I'm telling you that it's a waste.  It's that simple.

ATTORNEY BANGE:  Your Honor, the [C]hildren are still dependent.  So if they are dependent and in the home of a parent, and we're not doing anything, than [*sic*] the only alternative is for you to discontinue the adjudication of dependency.  We close.  And then maybe or maybe not the parents proceed with a custody action.

THE COURT:  You provide services to Mother, and don't have to provide services to Father.

ATTORNEY BANGE:  Is that the [c]ourt's directive?  Or you're just suggesting it be discontinued?

THE COURT:  I'll go whichever way you desire.

ATTORNEY BANGE:  His rights haven't been terminated.  I'm not sure why I'm making the argument.  But I think that's contrary to everything we do in each and every one of these cases.  I completely understand the [c]ourt's perspective, and I understand your desire as the [c]ourt as well to assure the safety of the children.

But I think this case is no different from any other case that we have where we have a parent who has committed a serious, violent crime perhaps.  And they go through anger management, and they go through this, that, and the other thing.  He gets a chance.  I mean, he still has protections as well.  So I think I'm just kind of taking off - -

THE COURT:  Do you prefer I make it advisory or put it in the order?

ATTORNEY BANGE:  I prefer that it not exist.

THE COURT:  That's not an option.

ATTORNEY BANGE:  We have a Family Service Plan, Your Honor, that indicates services to be provided.

THE COURT:  I'll ask the question again.  Would you like me to make it advisory or put it in the order that Father is to receive no more services towards reunification?

ATTORNEY BAGE:  That's your call.  I'm sorry - -

THE COURT:  I was trying to be nice.

ATTORNEY BANGE:  You're the [c]ourt.  I'm the Solicitor.

THE COURT:  Put it in the order that the Agency is to provide no more services for [Father] for reunification.

N.T., 12/22/17, at 19-34.  Thereafter, the trial court entered the Permanency

Review Order ordering CYF to cease services to Father, without any mention

of aggravated circumstances.  **See** Permanency Review Order, 12/22/17, at 1-2.

> [Father pled guilty to] "F-3, child pornography" for possession of photos of his step[-]daughter, M.C.  **See** [N.T., 12/22/17, at 13, 24].  The [trial court] found this to be an aggravated circumstance under two subsections to 42 Pa.C.S.[A.] § 6302.  The first, under [§] 6302(2), relating to M.C. being the victim of sexual violence by [Father], and the second, under [§] 6302(6), relating to [Father] being required to register as a sexual offender under Subchapter H of Chapter 97.
>
> Based on the finding of aggravated circumstances, the [trial court] made the decision to discontinue [Father's] services to move the focus of the dependency as it concerns [Father] from reunification to terminating parental rights ("TPR") of [Father]. However, the [trial court] did not change the goal to TPR for [Father].  Rather, the [trial court] only made it clear that the Agency should pursue such goal change at a future proceeding.

Trial Court Opinion, 1/29/18, at 3.

Here, neither CYF nor the Guardian *Ad Litem* filed a motion seeking a finding of aggravated circumstances, the parties did not discuss such a finding at the permanency review hearing, and the trial court did not place a finding in the Order at appeal.  **See** 42 Pa.C.S.A. § 6334(b); **see also In Interest of J.M.**, 166 A.3d at 418.  Indeed, the first mention of a finding of aggravated circumstances was in the trial court's Rule 1925(a) Opinion.  **See** Trial Court Opinion, 1/29/18, at 3.  Thus, the cessation of services based upon the purported finding of aggravated circumstances was clear error.  **See Youst v. Keck's Food Serv., Inc.**, 94 A.3d 1057, 1075 (Pa. Super. 2014) (stating that "a trial court speaks through its orders—not through advisory, Rule 1925(a)

opinions, which are issued only for the benefit of appellate review.")
(emphasis omitted). Absent a finding of aggravated circumstances, we must
look to the entirety of the record to determine whether the services should be
reinstated. **See In re R.P.**, 957 A.2d 1205, 1220 (Pa. Super. 2008) (stating
that the court may look at the totality of the circumstances, not only on its
determination that aggravated circumstances exist, in determining whether to
discontinue reunification services).

In the October 6, 2017 Order of Adjudication and disposition, the trial
court adjudicated Child dependent, and placed physical custody with Mother
and allowed Father to have supervised visits with Child. Order, 10/6/17, at
1-2. The trial court further ordered Father to "maintain safe, stable, and
appropriate housing," "attend counseling sessions," cooperate with the
"Intensive Family Services Team" and "therapy and other identified
program[s] to assist [Child] with understanding appropriate boundaries," and
"follow and complete all recommendations of [the] Triad evaluations."
Appendix to Order, 10/6/17, at 1-3.

At the commencement of the December 22, 2017 permanency review
hearing, CYF proffered the report from the Triad specialist, regarding the
anger management, and drug and alcohol evaluation of Father on November
21, 2017. N.T., 12/22/17, at 3-4. Edwards, the CYF caseworker, stated that
Father had been working full-time. **Id.** at 8. Edwards noted that Father had
started his "offending parenting treatment." **Id.** Edwards indicated that

- 15 -

Father had attended intakes with Triad for anger management and drug and alcohol, and that no additional treatment was recommended. *Id.* at 8-9, 21-22; *see also id.* at 9 (wherein Edwards noted that Father indicated at a sex offender counseling session that he had a few beers prior to attending, but that Father had not been tested that night). Father was also drug tested every month, and those results were negative. *Id.* at 7-8, 22. Edwards stated that Father sees Child "at least two times a week," but noted that it is "typically more than that, depending on [Father's] schedule." *Id.* at 8. Edwards testified that an in-home team was planning to begin working with Father. *Id.* at 11. Edwards also testified that Father's sister, A.R., was in the process of gaining approval as a supervisor for Father's visits with Child. *Id.* at 13. CYF recommended that the status quo be maintained, and that Father continue to follow through with his treatment and recommendations of CYF. *Id.* at 9-10.

Kearse testified that, although Mother believes there is a possibility that Father will come back to the household to live, Mother also believes that M.C., the older child, was too young, at the age of ten, to understand exactly what happened regarding Father and the felony he committed against her. *Id.* at 17-18. Both M.C. and Child, who was only five years old at the time of the hearing, were working with Grydlick, the family advocate, to understand the difference between good touch and bad touch. *Id.* at 14-15, 16. Kearse testified that it had not yet reached the point where they knew whether M.C.,

the older child, needed any type of play therapy once she understood what had happened. *Id.* at 18.

Based upon the evidence, the trial court entered the Permanency Review Order, which stated the following, in relevant part:

> There has been moderate compliance with [the] permanency plan, in that [Father] is currently residing in Felton[, Pennsylvania,] and is employed full-time. He has supervised visits with [Child]. He is receiving Sex Offender therapy through [Triad]. His first group session started November 17, 2017. He also completed intake assessments for anger management[,] and drug and alcohol counseling. A written report from [Triad] (Addendum to Initial Evaluation) was received today and shared with all [c]ounsel and the [c]ourt (not marked as an Exhibit).

Order, 12/22/17, at 1.

The evidence of record and the trial court's findings do not sustain the trial court's decision to terminate reunification efforts. Here, the trial court specifically found that Father was complying with the services and permanency plan. Importantly, Father had only been receiving services for just over two months, he was taking an active role in Child's life through the supervised visits, and attempting to maintain a relationship with Child. In point of fact, Father's sister was in the process of gaining approval to be a supervisor for Child's visits with Father. Moreover, the trial court did not consider Child's best interests. *See, e.g.,* Brief for Guardian *Ad Litem* at 16 (stating that "[b]y directing no further services to [Father] and stating that the court is unlikely to support any reunification, the court has failed to take into account [Child's] best interest and promote her relationship with a ready,

- 17 -

willing, and able parent."); *id.* (stating that "both Father and [C]hild were working towards a healthy and stable relationship under the purview of the court's jurisdiction with supervision and assistance from available services. Thus, enabling the relationship to build in the healthiest manner possible."); *see also In Interest of L.T.*, 158 A.3d 1266, 1280-81 (Pa. Super. 2017) (noting that the trial court disregarded evidence that mother and child had a close bond and that it was in child's best interests to continue the reunification efforts). Thus, because we conclude that the record before us is clearly not indicative of a parent wasting reunification resources, the trial court abused its discretion in terminating reunification services. *See In Interest of L.T.*, 158 A.3d at 1281-83 (concluding that the trial court abused its discretion when it changed child's permanency goal from reunification to adoption after only two months of services where mother complied with the services, regularly attended visitation and had a bond with child); *see also In Interest of C.K.*, 165 A.2d at 942, 944.

Based upon our conclusion, we reverse the Order and remand for the

reinstatement of reunification services for Father.[4]

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

---

[4] Recently, our Supreme Court held that under 23 Pa.C.S.A. § 2313(a), courts **must** appoint counsel to represent the legal interests of a child in a contested involuntary termination proceeding. *In re Adoption of L.B.M.*, 161 A.3d 172, 179-80 (Pa. 2017). Further, "during contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests." *In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018). The Supreme Court further explained,

> if the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S.[A.] § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings.

*Id.* at 1092-93. While this appeal was pending, this Court extended the requirements of *L.B.M.* and its progeny to dependency actions generally. *See In re J'K.M.*, 191 A.3d 907, 916 (Pa. Super. 2018) (reversing order denying appointment of a separate counsel for dependency proceedings where there was a conflict between the child's best interests and legal interests). Here, the preferred outcome of Child was not obtained, and there is no discernible conflict between her legal and best interests. Based upon our disposition, we decline to direct the trial court to appoint Child separate legal counsel. However, if, in the future, the trial court determines there is a conflict between Child's wishes and her best interests, Child must have separate legal counsel to advocate for those disparate interests in future proceedings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/20/2018